STATE of North Dakota, Plaintiff
and Appellee,

v.

Janice LEIDHOLM, Defendant
and Appellant.

Cr. No. 855.

Supreme Court of North Dakota.

May 12, 1983.

John Romanick, State's Atty., Washburn, for plaintiff and appellee State of N.D.

Irvin B. Nodland, of Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for defendant and appellant.

VANDE WALLE, Justice.

Janice Leidholm was charged with murder for the stabbing death of her husband, Chester Leidholm, in the early morning hours of August 7, 1981, at their farm home near Washburn. She was found guilty by a McLean County jury of manslaughter and was sentenced to five years' imprisonment in the State Penitentiary with three years of the sentence suspended. Leidholm appealed from the judgment of conviction. We reverse and remand the case for a new trial.

I

According to the testimony, the Leidholm marriage relationship in the end was an unhappy one, filled with a mixture of alcohol abuse, moments of kindness toward one another, and moments of violence. The alcohol abuse and violence was exhibited by both parties on the night of Chester's death.

Early in the evening of August 6, 1981, Chester and Janice attended a gun club party in the city of Washburn where they both consumed a large amount of alcohol.[1]

---

1. A Breathalyzer test administered to Janice shortly after the stabbing, at approximately

On the return trip to the farm, an argument developed between Janice and Chester which continued after their arrival home just after midnight. Once inside the home, the arguing did not stop; Chester was shouting, and Janice was crying.

At one point in the fighting, Janice tried to telephone Dave Vollan, a deputy sheriff of McLean County, but Chester prevented her from using the phone by shoving her away and pushing her down. At another point, the argument moved outside the house, and Chester once again was pushing Janice to the ground. Each time Janice attempted to get up, Chester would push her back again.

A short time later, Janice and Chester re-entered their home and went to bed. When Chester fell asleep, Janice got out of bed, went to the kitchen, and got a butcher knife. She then went back into the bedroom and stabbed Chester. In a matter of minutes Chester died from shock and loss of blood.

## II

Leidholm raises seven issues on appeal, but because of the particular disposition of the case, we do not find it necessary to answer all of them.

The first, and controlling, issue we consider is whether or not the trial court correctly instructed the jury on self-defense. Our resolution of the issue must of necessity begin with an explanation of the basic operation of the law of self-defense as set forth in Chapter 12.1–05 of the North Dakota Century Code.

Our criminal code is the product of a massive revision which began in 1971 and culminated in 1973 with the legislative enactment of Senate Bill No. 2045. Although remnants of the "old code" survived revision and remain in the present code, most of its provisions are in substantial part modeled after the Proposed New Federal Criminal Code[2] [Report of the North Dakota Legislative Council (1973) at 81], which in turn relies heavily on the American Law Institute Model Penal Code. See, generally, Working Papers (1970–1971). Both the Proposed Code and the Model Penal Code are highly integrated codifications of the substantive criminal law which exhibit close interrelationships between their respective parts. Final Report, Foreword at xiii (1971). This integration is especially apparent in Chapter 12.1–05 of the North Dakota Century Code, which is an almost complete adoption of Chapter 6 of the Proposed Code dealing with defenses involving justification and excuse. It is to Chapter 12.1–05, N.D.C.C., that we now turn.

■ Conduct which constitutes self-defense may be either justified [Section 12.1–05–03, N.D.C.C.] or excused [Section 12.1–05–08, N.D.C.C.]. Although the distinction between justification and excuse may appear to be theoretical and without significant practical consequence, because the distinction has been made in our criminal statutes we believe a general explanation of the difference between the two concepts—even though it requires us to venture briefly into the pathway of academicism—is warranted.

A defense of justification is the product of society's determination that the *actual existence* of certain circumstances will operate to make proper and legal what otherwise would be criminal conduct. A defense of excuse, contrarily, does not make legal and proper conduct which ordinarily would result in criminal liability; instead, it openly recognizes the criminality of the conduct but excuses it because the actor believed that circumstances actually existed which would justify his conduct when in fact they

3:30 a.m., showed her blood-alcohol content was .17 of 1 percent. The analysis of a blood sample from Chester showed his blood-alcohol content was .23 of 1 percent.

2. The Proposed New Federal Criminal Code ("Proposed Code") with annotations comprises the Final Report of the National Commission on Reform of Federal Criminal Laws (1971) ("Final Report") and is supplemented by three volumes of the Working Papers of the National Commission on the Reform of Federal Criminal Laws (1970–1971) ("Working Papers") which contain materials used by the Commission in drafting the Proposed Code.

did not. In short, had the facts been as he supposed them to be, the actor's conduct would have been justified rather than excused. See Final Report, Comment on § 601 at 44 (1971); Note, *Justification: The Impact of the Model Penal Code on Statutory Reform,* 75 Colum.L.Rev. 914 (1975); Note: *Justification and Excuse in the Judaic and Common Law: The Exculpation of a Defendant Charged With Homicide,* 52 N.Y. U.L.Rev. 599 (1977).

In the context of self-defense, this means that a person who believes that the force he uses is necessary to prevent imminent unlawful harm is *justified* in using such force if his belief is a *correct* belief; that is to say, if his belief corresponds with what actually is the case. If, on the other hand, a person *reasonably* but incorrectly believes that the force he uses is necessary to protect himself against imminent harm, his use of force is *excused.*

■ The distinction is arguably superfluous because whether a person's belief is correct and his conduct justified, or whether it is merely reasonable and his conduct excused, the end result is the same, namely, the person avoids punishment for his conduct. Furthermore, because a correct belief corresponds with an actual state of affairs, it will always be a reasonable belief; but a reasonable belief will not always be a correct belief, viz., a person may reasonably believe what is not actually the case.[3] Therefore, the decisive issue under our law of self-defense is not whether a person's beliefs are correct, but rather whether they are reasonable and thereby excused or justified. See Vol. I, Working Papers, Comment on Excuse at 271 (1970); *State v. Schimetz,* 328 N.W.2d 808 (N.D.1982); *State v. Hazlett,* 16 N.D. 426, 113 N.W. 374 (1907). See also ALI Model Penal Code § 3.04, Comment at 15, and § 3.09, Comment at 77–79 (Tentative Draft No. 8, 1958).

3. For example, a person may reasonably, but mistakenly, believe that a gun held by an assailant is loaded.

4. If the danger against which a person uses force to defend himself is "death, serious bodily injury, or the commission of a felony involving violence," the person may use deadly force

Section 12.1–05–08, N.D.C.C., which sets forth the general conditions that excuse a person's conduct, states:

"A person's conduct is excused if he believes that the facts are such that his conduct is necessary and appropriate for any of the purposes which would establish a justification or excuse under this chapter, even though his belief is mistaken. However, if his belief is negligently or recklessly held [i.e., unreasonably], it is not an excuse in a prosecution for an offense for which negligence or recklessness, as the case may be, suffices to establish culpability. Excuse under this section is a defense or affirmative defense according to which type of defense would be established had the facts been as the person believed them to be."

The first sentence of Section 12.1–05–08, N.D.C.C., in combination with Section 12.1–05–03, N.D.C.C., which contains the kernel statement of self-defense, yields the following expanded proposition: A person's conduct is excused if he *believes* that the use of force upon another person is necessary and appropriate to defend himself against danger of imminent unlawful harm, even though his belief is mistaken.[4] Thus we have a statement of the first element of self-defense, i.e., a person must actually and sincerely believe that the conditions exist which give rise to a claim of self-defense. See Vol. I, Working Papers, Comment on Excuse, at 271–272 (1970). See also *State v. Jacob,* 222 N.W.2d 586 (N.D.1974); *Hazlett, supra,* 113 N.W. at 380.

From the next sentence of Section 12.1–05–08 we may infer that, besides being actual and sincere, a person's belief that the use of force is necessary to protect himself against imminent unlawful harm must be reasonable. Here, we have the second element of self-defense, namely, a person must

[Section 12.1–05–07, N.D.C.C.], which is defined as that force "which a person uses with the intent of causing, or which he knows creates a substantial risk of causing, death or serious bodily injury." Sec. 12.1–05–12(2), N.D.C.C.

reasonably believe that circumstances exist which permit him to use defensive force. See Vol. I, Working Papers, Comment on Excuse, at 271–272 (1970). See also *Jacob, supra,* 222 N.W.2d at 588–589; *Hazlett, supra,* 113 N.W. at 380.

If, therefore, a person has an actual and reasonable belief that force is necessary to protect himself against danger of imminent unlawful harm, his conduct is justified or excused. See Sec. 12.1–05–08, N.D.C.C.; Vol. I, Working Papers, Comment on Excuse, at 271 (1970). If, on the other hand, a person's actual belief in the necessity of using force to prevent imminent unlawful harm is unreasonable, his conduct will not be justified or excused. See Sec. 12.1–05–08, N.D.C.C.; Final Report, Comment on § 608, *Excuse,* at 52 (1971); Vol. I, Working Papers, Comment on Excuse, at 271 (1970). Instead, he will be guilty of an offense for which negligence or recklessness suffices to establish culpability. See Sec. 12.1–05–08, N.D.C.C. For example, if a person recklessly believes that the use of force upon another person is necessary to protect himself against unlawful imminent serious bodily injury *and* the force he uses causes the death of the other person, he is guilty of manslaughter. See Sec. 12.1–16–02(1), N.D.C.C.; Vol. I, Working Papers, Comment on Excuse, at 271 (1970); Cf. ALI Model Penal Code and Commentaries, Part II, § 210.3(a), Comment at 74–75 (1980); ALI Model Penal Code, § 3.04, Comment at 15, and § 3.09, Comment at 78–79 (Tent.Draft No. 8, 1958); Note, *Justification: The Impact of the Model Penal Code on Statutory Reform,* 75 Colum.L.Rev. 914 (1975). And if a person's belief is negligent in the same regard, he is guilty of negligent homicide. See Sec. 12.1–16–03, N.D.C.C.

We are not the only State to make distinctions like this in the law of self-defense. Other States distinguish between reasonable and unreasonable beliefs when attaching liability for acts assertedly committed in self-defense. E.g., *Weston v. State,* 656 P.2d 1186 (Alaska App.1982); *People v. Scott,* 53 Ill.Dec. 657, 97 Ill.App.3d 899, 424 N.E.2d 70 (1981); *State v. Mendoza,* 80 Wis.2d 122, 258 N.W.2d 260 (1977). However, they do not further subdivide the class of unreasonably held beliefs, as our Legislature has done, into the subclass of recklessly held beliefs and the subclass of negligently held beliefs. Still, such interpretations do not significantly differ from our own.

Under both approaches, if a person reasonably believes self-defense is necessary, his conduct is excused or justified. And even though under our view an unreasonable belief may result in a conviction for either manslaughter or negligent homicide, and under theirs an unreasonable belief may result only in a conviction for manslaughter, they are the same to the extent that an honest but unreasonable belief will never result in a conviction for murder.

It must remain clear that once the factfinder determines under a claim of self-defense that the actor honestly and sincerely held the belief that the use of defensive force was required to protect himself against imminent unlawful injury, the actor may not be convicted of more than a crime of recklessness or negligence; but, if the factfinder determines, to the contrary, that the actor did not honestly and sincerely hold the requisite belief under a claim of self-defense, the actor may not appeal to the doctrine of self-defense to avoid punishment, but will be subject to conviction for the commission of an intentional and knowing crime. See Sec. 12.1–05–08, N.D.C.C.; Vol. I, Working Papers, Comment on Excuse, at 271–272 (1970). See also *Weston, supra,* 656 P.2d at 1187–1188; *Scott, supra,* 53 Ill.Dec. at 659–60, 424 N.E.2d at 72–73.

As stated earlier, the critical issue which a jury must decide in a case involving a claim of self-defense is whether or not the accused's belief that force is necessary to protect himself against imminent unlawful harm was reasonable. However, before the jury can make this determination, it must have a standard of reasonableness against which it can measure the accused's belief.

Courts have traditionally distinguished between standards of reasonableness by characterizing them as either "objective" or "subjective." E.g., *State v. Simon,* 231

Kan. 572, 646 P.2d 1119 (1982). An objective standard of reasonableness requires the factfinder to view the circumstances surrounding the accused at the time he used force from the standpoint of a hypothetical reasonable and prudent person. E.g., *Mendoza, supra,* 258 N.W.2d at 272. Ordinarily, under such a view, the unique physical and psychological characteristics of the accused are not taken into consideration in judging the reasonableness of the accused's belief. See *State v. Cadotte,* 17 Mont. 315, 42 P. 857 (1895). See also *People v. Cisneros,* 34 Cal.App.3d 399, 110 Cal.Rptr. 269 (1973); *State v. Baker,* 103 Idaho 43, 644 P.2d 365 (1982); *State v. Rodriguez,* 93 Idaho 286, 460 P.2d 711 (1969).

This is not the case, however, where a subjective standard of reasonableness is employed. See *State v. Wanrow,* 88 Wash.2d 221, 559 P.2d 548 (1977). Under the subjective standard the issue is not whether the circumstances attending the accused's use of force would be sufficient to create in the mind of a reasonable and prudent person the belief that the use of force is necessary to protect himself against immediate unlawful harm, but rather whether the circumstances are sufficient to induce in *the accused* an honest and reasonable belief that he must use force to defend himself against imminent harm. *Jacob, supra,* 222 N.W.2d at 588–589; *Hazlett, supra,* 113 N.W. at 381; *Wanrow, supra,* 559 P.2d at 558–559; *State v. Kelly,* 33 Wash.App. 541, 655 P.2d 1202 (1982); *State v. Adams,* 31 Wash.App. 393, 641 P.2d 1207 (1982); *State v. Painter,* 27 Wash.App. 708, 620 P.2d 1001 (1980). Cf. *People v. Robinson,* 79 Mich. App. 145, 261 N.W.2d 544 (1977) [where the court did not impose a requirement that the accused's belief be reasonable; *contra, People v. Green,* 113 Mich.App. 699, 318 N.W.2d 547 (1982)].

Neither Section 12.1–05–03, N.D. C.C., nor Section 12.1–05–08, N.D.C.C., ex-plicitly states the viewpoint which the factfinder should assume in assessing the reasonableness of an accused's belief. Moreover, this court has not yet decided the issue of whether Sections 12.1–05–03 and 12.1–05–08 should be construed as requiring an objective or subjective standard to measure the reasonableness of an accused's belief under a claim of self-defense. Finally, the legislative history of our self-defense statutes, as well as the commentaries to the codified criminal statutes which form the basis of the North Dakota Criminal Code, give no indication of a preference for an objective standard of reasonableness over a subjective standard, or vice versa.[5]

We do, however, find guidance for our decision on this issue from past decisions of this court which developed the law of self-defense prior to the adoption in 1975 of Chapter 12.1–05, N.D.C.C. In 1907, the members of this court, confronted with the same issue whether to adopt an objective or subjective standard of reasonableness, unanimously decided to accept the latter standard for judging the reasonableness of an accused's belief because they believed it to be more just than an objective standard. *Hazlett, supra,* 113 N.W.2d at 380–381. As late as 1974, this court has confirmed that early decision. *Jacobs, supra,* 222 N.W.2d at 588–589.

Because (1) the law of self-defense as developed in past decisions of this court has been interpreted to require the use of a subjective standard of reasonableness, and (2) we agree with the court in *Hazlett* that a subjective standard is the more just, and (3) our current law of self-defense as codified in Sections 12.1–05–03, 12.1–05–07, and 12.1–05–08 does not require a contrary conclusion, that is to say, our current law of self-defense is consistent with either a subjective or objective standard, we now decide that the finder of fact must view the circumstances attending an accused's use of

---

**5.** One defense in Chapter 12.1–05, N.D.C.C., which involves an objective standard is entrapment. In Section 12.1–05–11(2), N.D.C.C., the Legislature, by the specific words "likely to cause *normally law-abiding persons* to commit the offense," eliminated the subjective test for that defense. *State v. Pfister,* 264 N.W.2d 694 (N.D.1978). See also *State v. Hoffman,* 291 N.W.2d 430 (N.D.1980); *State v. Unterseher,* 289 N.W.2d 201 (N.D.1980); *State v. Folk,* 278 N.W.2d 410 (N.D.1979); *State v. Mees,* 272 N.W.2d 284 (N.D.1978).

force from the standpoint of the accused to determine if they are sufficient to create in the accused's mind an honest and reasonable belief that the use of force is necessary to protect himself from imminent harm. *Jacobs, supra,* 222 N.W.2d at 588–589; *Hazlett, supra,* 113 N.W. at 380; *People v. White,* 42 Ill.Dec. 578, 87 Ill.App.3d 321, 409 N.E.2d 73 (1980); *People v. Pappas,* 23 Ill. Dec. 163, 66 Ill.App.3d 360, 383 N.E.2d 1190 (1978), *cert. denied* 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 55 (1979); *People v. Kelly,* 24 Ill.App.3d 1018, 322 N.E.2d 527 (1975); *Gunn v. State,* 174 Ind.App. 26, 365 N.E.2d 1234 (1977); *Wanrow, supra,* 559 P.2d at 558–559; *Kelly, supra,* 655 P.2d at 1203; *Adams, supra,* 641 P.2d at 1209; *Painter, supra,* 620 P.2d at 1003.

The practical and logical consequence of this interpretation is that an accused's actions are to be viewed from the standpoint of a person whose mental and physical characteristics are like the accused's and who sees what the accused sees and knows what the accused knows. *Robinson, supra,* 261 N.W.2d at 552; *Wanrow, supra,* 559 P.2d at 558–559; *State v. Crigler,* 23 Wash.App. 716, 598 P.2d 739 (1979); *Kelly, supra,* 655 P.2d at 1203. See also *Green, supra,* 318 N.W.2d at 548–550. For example, if the accused is a timid, diminutive male, the factfinder must consider these characteristics in assessing the reasonableness of his belief. If, on the other hand, the accused is a strong, courageous, and capable female, the factfinder must consider these characteristics in judging the reasonableness of her belief.

■ In its statement of the law of self-defense, the trial court instructed the jury:

"The circumstances under which she acted must have been such as to produce in the mind of reasonably prudent persons, regardless of their sex, similarly situated, the reasonable belief that the other person was then about to kill her or do serious bodily harm to her."

In view of our decision today, the court's instruction was a misstatement of the law of self-defense. A correct statement of the law to be applied in a case of self-defense is:

"[A] defendant's conduct is not to be judged by what a reasonably cautious person might or might not do or consider necessary to do under the like circumstances, but what he himself in good faith honestly believed and had reasonable ground to believe was necessary for him to do to protect himself from apprehended death or great bodily injury." *Hazlett, supra,* 113 N.W. at 380.

The significance of the difference in viewing circumstances from the standpoint of the "defendant alone" rather than from the standpoint of a "reasonably cautious person" is that the jury's consideration of the unique physical and psychological characteristics of an accused allows the jury to judge the reasonableness of the accused's actions against the accused's subjective impressions of the need to use force rather than against those impressions which a jury determines that a hypothetical reasonably cautious person would have under similar circumstances. *Kelly, supra,* 655 P.2d at 1203; *State v. Jones,* 32 Wash.App. 359, 647 P.2d 1039 (1982); *Painter, supra,* 620 P.2d at 1003; *Crigler, supra,* 598 P.2d at 742. See also *Commonwealth v. Watson,* 494 Pa. 467, 431 A.2d 949 (1981).

Hence, a correct statement of the law of self-defense is one in which the court directs the jury to assume the physical and psychological properties peculiar to the accused, viz., to place itself as best it can in the shoes of the accused, and then decide whether or not the particular circumstances surrounding the accused at the time he used force were sufficient to create in his mind a sincere and reasonable belief that the use of force was necessary to protect himself from imminent and unlawful harm. See *Hazlett, supra,* 113 N.W. at 380–381; *Wanrow, supra,* 559 P.2d at 558–559; *Painter, supra,* 620 P.2d at 1003–1004. Cf. *Robinson, supra,* 261 N.W.2d at 552.

■ Leidholm argued strongly at trial that her stabbing of Chester was done in self-defense and in reaction to the severe mistreatment she received from him over

the years. Because the court's instruction in question is an improper statement of the law concerning a vital issue in Leidholm's defense, we conclude it amounts to reversible error requiring a new trial. See *State v. Trieb*, 315 N.W.2d 649 (N.D.1982).

### III

Although we decide that this case must be sent back to the district court for a new trial, there still remain several other issues raised by Leidholm on appeal which must be addressed to ensure a proper disposition of the case on remand.

Expert testimony was presented at trial on what has come to be commonly referred to as the "battered woman syndrome." Such testimony generally explains the "phenomenon" as one in which a regular pattern of spouse abuse[6] creates in the battered spouse low self-esteem and a "learned helplessness," i.e., a sense that she cannot escape from the abusive relationship she has become a part of. See Comment, *The Admissibility of Expert Testimony on the Battered Woman Syndrome in Support of a Claim of Self-Defense*, 15 Conn.L.Rev. 121 (1982).

The expert witness in this case testified that Janice Leidholm was the victim in a battering relationship which caused her to suffer battered woman syndrome manifested by (1) a psychological condition of low self-esteem and (2) a psychological state of "learned helplessness." On the basis of the expert testimony, Leidholm offered the following proposed instruction on battered woman syndrome:

"A condition known or described by certain witnesses as the 'battered wife syndrome' if shown by the evidence to have existed in the accused at the time she allegedly committed the crime charged, is not of itself a defense. How-

ever, as a general rule, whether an accused was assaulted by the victim of the homicide prior to the commission of a fatal act by the accused may have relevance in determining the issue of self defense.

"Whenever the actual existence of any particular purpose, motive or intent is a necessary element to the commission of any particular species or degree of crime, you may take into consideration evidence that the accused was or had been assaulted by the victim in determining the purpose, motive or intent with which the act was committed.

"Thus, in the crime of murder of which the accused is charged in this case, specific intent is a necessary element of the crime. So, evidence the accused acted or failed to act while suffering the condition known as the 'battered wife syndrome' may be considered by the jury in determining whether or not the accused acted in self defense. The weight to be given the evidence on that question, and the significance to attach to it in relation to all the other evidence in the case, are for you the jury to determine."[7]

The court's refusal to include the proposed instruction in its charge to the jury, Leidholm contends, was error.

■■■ The instruction on battered woman syndrome was designed to support Leidholm's claim of self-defense by focusing the jury's attention on the psychological characteristics common to women who are victims in abusive relationships, and by directing the jury that it may consider evidence that the accused suffered from battered woman syndrome in determining whether or not she acted in self-defense. The instruction correctly points out that battered woman syndrome is *not of itself* a defense. In other words, "The existence of the syn-

---

**6.** Typically, the pattern begins with a tension-building phase, followed by an intermediate phase where one spouse physically, with undoubted psychological effects, abuses the other, and a final phase where the battering spouse feels remorse for his actions and then attempts to "make up" with the battered spouse.

**7.** Leidholm's counsel in his brief indicates that an instruction almost identical with this one was given in *United States v. Mary Ann Ironshield*, No. C1–81–40 (D.N.D.1982), and *United States v. Vicki Starr*, No. C1–79–33 (D.N.D. 1980).

drome in a marriage does not of itself establish the legal right of the wife to kill the husband, the evidence must still be considered in the context of self-defense." [8] *Kelly, supra,* 655 P.2d at 1203.

▮ There is nothing in the proposed instruction at issue which would add to or significantly alter a correct instruction on the law of self-defense. The jury's use of a subjective standard of reasonableness in applying the principles of self-defense to the facts of a particular case requires it to consider expert testimony, once received in evidence, describing battered woman syndrome and the psychological effects it produces in the battered spouse when deciding the issue of the *existence* and *reasonableness* of the accused's belief that force was necessary to protect herself from imminent harm. If an instruction given is modeled after the law of self-defense which we adopt today, the court need not include a specific instruction on battered woman syndrome in its charge to the jury.

## IV

▮ An inseparable and essential part of our law of self-defense limits the use of deadly force to situations in which its use is necessary to protect the actor against death or serious bodily injury. Sec. 12.1–05–07(2)(b), N.D.C.C. However, the use of deadly force by an actor in self-defense is not justified if a retreat from the assailant can be accomplished with safety to the actor and others. Sec. 12.1–05–07(2)(b), N.D.C.C. Thus, before it can be said that the use of deadly force is "necessary" to protect the actor against death or serious injury, it must first be the case that the actor cannot retreat from the assailant with safety to himself and others. In short, the use of deadly force is not necessary (and therefore not justified) within the meaning of our law of self-defense unless the actor has no safe avenue of retreat.[9]

The practical effect of this statement is that the jury must first satisfy itself that an actor could not safely retreat before it can find that the actor's use of deadly force was necessary to protect himself against death or serious injury. And the way in which the jury determines whether or not the actor could not retreat safely is by considering whether or not the actor honestly and reasonably believed that he could not retreat from his attacker with safety. See Sections 12.1–05–07(2)(b) and 12.1–05–08, N.D.C.C.; Note, *Justification: The Impact of the Model Penal Code on Statutory Reform,* 75 Colum.L.Rev. 914, 938 (1975).

The duty to retreat, however, is not a rule without exceptions. Section 12.1–05–07(2)(b), N.D.C.C., provides, in part:

"... (2) *no person is required to retreat from his dwelling,* or place of work, *unless he was the original aggressor or is assailed by a person who he knows also*

---

**8.** And, if the particular facts of a defendant's case do not fit well with a claim of self-defense, the defendant perhaps should consider abandoning any such claim because the law of self-defense will not be judicially orchestrated to accommodate a theory that the existence of battered woman syndrome in an abusive relationship operates in and of itself to justify or excuse a homicide. When a battered spouse argues that a killing was committed in self-defense, the issue raised is not whether the battered spouse believes that homicide or suicide are the only available solutions to the problems she faces in her relationship with the abusive spouse, nor is it whether the cumulative effect of a series of beatings caused the battered spouse to react violently "under the influence of extreme emotional disturbance" by killing the batterer; under a claim of self-defense the only issue is whether the circumstances surrounding the killing were sufficient to create in the accused's mind *an honest and sincere belief that the use of deadly force is necessary to defend herself against imminent unlawful harm.* See *Kelly, supra,* 655 P.2d at 1203.

**9.** This principle follows strictly from the language of Section 12.1–05–07(2)(b). It states that the use of deadly force is *justified* if such force is *necessary* to protect the actor against death or serious injury. It also states that the use of deadly force is *not justified* if the actor *can retreat* with safety to himself and others. Therefore, if the actor *can retreat* (and the use of deadly force is not justified), the use of deadly force cannot be necessary (i.e., justified); otherwise, the use of such force would be at the same time both "not justified" and "justified."

*dwells* or works *there."* [Emphasis added.]

■ Included within the trial court's instruction to the jury on the law of self-defense was a statement roughly equivalent to the underscored language above. Leidholm maintains that the principle stated by this language violates the Equal Protection Clause, the Due Process Clause, and the Privileges and Immunities Clause of Article 14, Section 1, of the Amendments to the United States Constitution. Her argument seems to be that making an individual's duty to retreat from his dwelling dependent upon the status of the assailant unduly discriminates against the accused if the attacker is a cohabitant. We find no merit in this argument.

■ If the facts and circumstances attending a person's use of deadly force against an assailant who is a cohabitant are sufficient to create in his own mind an honest and reasonable belief that he cannot retreat from the assailant with safety to himself and others, his use of deadly force is justified or excused, and his failure to retreat is of no consequence. See Sections 12.1–05–07(2)(b) and 12.1–05–08, N.D.C.C. Cf. *Hazlett, supra,* 113 N.W. at 380.

This is a certain corollary to the guiding principle in our law of self-defense that the reasonableness of an accused's belief is to be measured against the accused's subjective impressions and not against the impressions which a jury might determine to be objectively reasonable.

## V

Leidholm also argues it was error for the trial court to instruct the jury that manslaughter is a lesser included offense of murder.

■ Whether or not a lesser included offense instruction on manslaughter is appropriate in a murder trial depends upon the particular facts and circumstances of the case. See *Trieb, supra,* 315 N.W.2d at 656. We have no question that the court's instruction on manslaughter was warranted in this case. See *Trieb, supra,* 315 N.W.2d

at 656–657; Vol. II, Working Papers, Comment on Manslaughter, at 829 (1970).

■ Moreover, any time the court instructs a jury on self-defense, it must of necessity include a special instruction on manslaughter as well as an instruction on negligent homicide. Sec. 12.1–05–08, N.D. C.C.; Vol. I, Working Papers, Comment on Excuse, at 271–272 (1970). See also *Scott, supra,* 53 Ill.Dec. 659–60, 424 N.E.2d at 72–73. The difference between self-defense and manslaughter is the reasonableness of the accused's belief that the use of force is necessary to prevent imminent unlawful harm. If the accused's belief is reasonable, he will be found to have acted in self-defense. If unreasonable, he is guilty of either manslaughter or negligent homicide, depending upon whether his belief was held recklessly or negligently, respectively. Sec. 12.1–05–08, N.D.C.C.; Final Report, Comment on § 608, *Excuse,* at 52 (1971); Vol. I, Working Papers, Comment on Excuse, at 271 (1970). See also *Weston, supra,* 656 P.2d at 1187–1188; *Scott, supra,* 53 Ill.Dec. at 659–60, 424 N.E.2d at 72–73.

## VI

Prior to the commencement of trial, Leidholm's attorney moved the district court of McLean County for an order granting a change of venue. The motion was denied, which Leidholm alleges was error.

According to Rule 21(a), N.D.R.Crim.P., "if the court is satisfied that there exists in the county or municipality where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial," a motion for change of venue should be granted.

Leidholm argues that the pre-trial publicity attending this case precluded the possibility of her receiving a fair and impartial trial in McLean County. As evidence of the prejudicial atmosphere which allegedly prevailed in McLean County, Leidholm refers us to pre-trial local newspaper coverage of Chester Leidholm's death plus selected comments of prospective jurors during voir dire.

A motion for change of venue is addressed to the sound discretion of the trial court, and the trial court's decision on the motion will not be reversed absent a showing of abuse of discretion prejudicial to the defendant. *State v. Engel*, 289 N.W.2d 204 (N.D.1980); *Olson v. North Dakota Dist. Court, Etc.*, 271 N.W.2d 574 (N.D. 1978).

In its order denying the pre-trial motion for change of venue, the district judge stated that the newspaper coverage concerning Leidholm's case did not "exhibit or show a general attitude of prejudice or the distinct possibility of prejudgment as to the issues involved in this case." And again, when the motion was renewed following voir dire examination of 12 members of the jury panel, the trial judge answered, "I am satisfied at this point that a fair, impartial jury of 12 people can be found amidst those 70 some people we have in this courtroom."

Our examination of the newspaper coverage preceding the trial as well as the selected comments from the voir dire of the jury panel does not cause us to take issue with the trial court's conclusions in support of its denial of the motions for change of venue. We find no abuse of discretion on the part of the trial court in denying the motions.

However, this is not to say that a motion for change of venue would be improper on remand, or that if made on remand, the trial court must deny it. The import of our decision on this issue is that the trial court did not, in view of the facts in existence at the time the motion was made and renewed, abuse its discretion in denying the motions for change of venue. Whether or not the publicity generated by the past trial or the events which lead up to the new trial require a change of venue is a matter for the trial court to decide anew should it arise.

## VII

The final issue which we will consider is whether or not the trial court erred when it denied Leidholm's motion for judgment of acquittal at the close of the State's case in chief.

Leidholm's argument is that the introduction of State's Exhibit 17—notes of Dr. Thakor, a psychiatrist, recorded from two separate interviews with Leidholm—provided some evidence of insanity which rebutted the usual presumption of sanity and required the State to prove beyond a reasonable doubt that she was sane at the time of the alleged murder. And, Leidholm continues, because the State did not offer any proof of sanity until after the defense had rested, the court should have granted the motion for judgment of acquittal.

It is a generally accepted rule that a defendant is presumed to be sane at the time he commits the offense for which he is charged. E.g., *United States v. American Horse*, 671 F.2d 286 (8th Cir.1982). Yet it is not settled whether the defendant has the burden to introduce evidence sufficient to overcome the presumption and place his mental capacity at the time of the crime in issue, or whether such evidence may be introduced by either side. There is some authority for the proposition that evidence presented by the State, as well as by the defendant, may be sufficient to rebut the presumption of sanity. *United States v. Bettenhausen*, 499 F.2d 1223 (10th Cir. 1974); *State v. Nemechek*, 223 Kan. 766, 576 P.2d 682 (1978); *Herron v. State*, 287 So.2d 759 (Miss.1974), *cert. denied* 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974). However, the prevailing view appears to be that the defendant has the burden of rebutting the presumption and cannot rely on evidence presented by the State which inadvertently may have the effect of negating the presumption. *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1978), *cert. denied* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *State v. Parker*, 113 Ariz. 560, 558 P.2d 905 (1976); *Pierce v. State*, 243 Ga. 454, 254 S.E.2d 838 (1979); *People v. Spears*, 20 Ill.Dec. 445, 63 Ill.App.3d 510, 380 N.E.2d 423 (1978); *State v. Trask*, 581 S.W.2d 417 (Mo.1979); *State v. Hartley*, 90 N.M. 488, 565 P.2d 658 (1977); *People v. Silver*, 33 N.Y.2d 475, 354 N.Y.S.2d 915, 310

N.E.2d 520 (1974); *Bills v. State,* 585 P.2d 1366 (Okla.1978).

We do not have to decide now between these contrary positions because there is a currently existing statutory basis in our law for a resolution of this issue.

Section 12.1–01–03(2) states, in pertinent part:

"2. Subsection 1 does not require [the State's] negating a defense:[10] ... *b.* by proof, unless the issue is in the case as a result of evidence *sufficient to raise a reasonable doubt on the issue.*" [Emphasis added.]

 Regardless of the source of the evidence in this case, we conclude that State's Exhibit 17 is insufficient to "raise a reasonable doubt" on the issue of Leidholm's sanity, and therefore the State was not required in its case in chief to prove beyond a reasonable doubt that Leidholm was sane at the time in question. Leidholm maintains that her mental capacity became an issue during the State's case in chief with the introduction of State's Exhibit 17 because it contained Dr. Thakor's diagnosis that Leidholm was suffering from "depressive neurosis," which is classified as a form of mental illness, and because it contained several statements made by Leidholm to Dr. Thakor which, Leidholm suggests, show she wasn't aware of her actions when she stabbed Chester.

We disagree for a number of reasons:

1. Leidholm's statements to Dr. Thakor which she believes give some indication that she was not conscious of her actions when Chester was killed are of dubious significance because State's Exhibit 17 also includes a statement by Dr. Thakor that "[she] seems to remember in great detail what has transpired about the episode [i.e., stabbing Chester]."

2. Although Leidholm states in her brief that "depressive neurosis" is a mental illness, there is no corresponding statement in State's Exhibit 17 to that effect. The equivalence established between "depressive neurosis" and mental illness is supplied by Leidholm in her brief, not by the exhibit at issue.

3. Furthermore, even if we were to assume that it may readily be inferred from the fact a person suffers from depressive neurosis that the person is mentally ill, we are unwilling to say that a person who is mentally ill necessarily is insane and lacks responsibility for his criminal conduct.

4. Lastly, the defense of lack of criminal responsibility by reason of mental disease or defect requires that the claimed mental disease or defect exist *at the time of the alleged crime.* It is obvious upon reading Dr. Thakor's notes that he diagnosed Leidholm as *presently* suffering from depressive neurosis. There is no statement in State's Exhibit 17 which can reasonably be read as an assertion that at the time of the alleged crime, Leidholm had a mental disease or defect.

Consequently, State's Exhibit 17 does not raise the issue whether or not Leidholm was sane when she stabbed Chester, and the court therefore did not err in refusing to grant Leidholm's motion for judgment of acquittal.

The judgment of conviction is reversed and the case is remanded to the district court of McLean County for a new trial.

ERICKSTAD, C.J., and PEDERSON, SAND and PAULSON, JJ., concur.

---

10. Insanity is a defense. Sec. 12.1–04–03, N.D. C.C. Rule 12.2, N.D.R.Crim.P., requires that a defendant who intends to rely upon this defense must give notice of his intention to the prosecution. Leidholm gave notice of her intention to proceed under Rule 12.2.